# IN THE COURT OF APPEALS OF IOWA

No. 22-0100
Filed October 19, 2022

**PRIMEBANK, INC.,**
        Plaintiff-Appellee,

**vs.**

**WILLARD TeGROOTENHUIS, as Trustee of the WILLARD TeGROOTENHUIS REVOCABLE TRUST DATED APRIL 25, 2013, and WILLARD TeGROOTENHUIS REVOCABLE TRUST DATED APRIL 25, 2013,**
        Defendants-Appellants.
_____

Appeal from the Iowa District Court for Sioux County, Jeffrey L. Poulson, Judge.

The trust appeals the foreclosure decree, asking us to set the order the sale proceeds are applied to the various defendants' outstanding debts and challenging whether the bank is entitled to recover attorney fees. **AFFIRMED IN PART AND REVERSED IN PART.**

Richard H. Moeller of Moore, Corbett, Heffernan, Moeller & Meis, L.L.P., Sioux City, for appellants.

Scott C. Sandberg of Spencer Fane LLP, Denver, Colorado, and Joshua C. Dickinson of Spencer Fane LLP, Omaha, Nebraska, for appellee.

Heard by Bower, C.J., Badding, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2022).

**POTTERFIELD, Senior Judge.**

The Willard TeGrootenhuis Revocable Trust dated April 15, 2013 (the Trust)[1] asks us to interpret the language of a mortgage it gave to Primebank Inc. (Primebank) to secure the debt of the trustee's son, Scott TeGrootenhuis.[2] Because we find no ambiguity in the relevant mortgage provisions, we agree with the district court that the contract should be applied as written. We affirm in part and reverse in part the district court's ruling regarding Primebank's right to recover attorney fees from the Trust.

**I. Background Facts and Proceedings.**

Scott owned an acreage on 400th Street, and in 2013, he built a house, shop, and machine shed on the property. In 2015, he added a 400-head cattle facility. These projects were funded at two separate banks. Then, in 2015, Scott approached Primebank with an application for credit to refinance his existing loans with the other banks and for operating loans to finance his farm operation, which included crops and feeding livestock.

After negotiations with Scott, Primebank came up with a "collateral package" that supported the financing Scott was requesting. On May 11, 2015, Primebank and Scott executed a note for $1,100,000 for the purpose of "crop operating"; this note was largely guaranteed by the Farm Services Agency (FSA).[3]

---

[1] We ascribe the actions of Willard TeGrootenhuis, the trustee, to the Trust.

[2] For ease, we do not distinguish between the non-appealing defendants; we ascribe the actions of any and all of the other defendants—Willard's son, Scott TeGrootenhuis; Scott's wife, Michelle TeGrootenhuis; and their limited liability company, B-40 Farms—to Scott. These defendants are not parties to this appeal.

[3] The FSA required Scott to give a second, junior mortgage on the 400th Street acreage as collateral for the $1,100,000 loan—his mortgage does not impact this

The same day, Scott also executed a $977,000 note[4] to refinance his 400th Street acreage. To secure this note, Scott gave Primebank a mortgage on the 400th Street acreage. Also on May 11, the Trust executed its own note with Primebank for $590,000 to refinance the Trust's farm. The Trust gave Primebank a first mortgage to secure the Trust's note and a second mortgage, up to $800,000, to secure Scott's $977,000 note.

Over the next few years, Scott executed ten more promissory notes with Primebank. Then in late 2019, Scott became insolvent. Primebank received hundreds of checks for which Scott had nonsufficient funds; other creditors of Scott—holders of about $1 million in unpaid debt—began contacting the bank; and Scott admitted the farm operation could not afford to feed the pigs (which were collateral for at least one of his notes with Primebank).

Primebank brought suit in January 2020, alleging that all twelve of the notes[5] Scott executed were in default and seeking judgment against Scott for the unpaid balances—more than $8 million in total—plus interest, attorney fees, and costs. It also sought to foreclose the $800,000 second mortgage on the Trust's farm (but not the first mortgage).

---

appeal. Any and all references to Scott's 400th Street mortgage are meant to refer to the first mortgage.

[4] When referring to the notes by their amount, we have rounded to the nearest thousand.

[5] The twelve notes were: $1,100,000 note executed on May 11, 2015; $977,000 note executed on May 11, 2015; $1,471,000 note executed on September 27, 2017; $138,000 note executed on September 27, 2017; $121,000 note executed on September 27, 2017; $125,000 note executed on June 5, 2018; $2,847,000 note executed on September 26, 2018; $821,000 note executed on September 26, 2018; $300,000 note executed on September 26, 2018; $386,000 note executed on September 26, 2018; $50,000 note executed on September 26, 2018; and $175,000 note executed on December 11, 2019.

Due to the COVID-19 pandemic and a proclamation from Governor Kim Reynolds, the foreclosure proceedings were suspended in March 2020. But, at Primebank's request, the court entered default judgment against Scott for money judgments on each of the twelve notes in default. Nothing was done at that time to obtain judgments enforcing the mortgages.

In May, Primebank dismissed without prejudice some of its original claims, including its claim to foreclose the second mortgage on the Trust's farm.

In September 2020, Primebank asked for leave to file an amended petition, claiming that after it filed its original petition in January 2020, "COVID-19 restrictions prevented foreclosure prosecution and the [Trust] defaulted on its promissory note [of $590,000]." In the proposed amended petition, Primebank's thirteenth claim for relief referenced the notice of default and right to cure it sent to the Trust, which reported that, due to some of Scott's notes that were in default and the Trust's second mortgage being in default (the mortgage securing up to $800,000 on Scott's $977,000 note), the first mortgage—securing the Trust's note—was also in default. Primebank relied on the following language from the Trust's note, where the Trust was the borrower or grantor and Primebank was the lender or grantee:

> DEFAULT. Each of the following shall constitute an event of default ("Event of Default") under this Note:
> . . . .
> Other Defaults. Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.
> Default in Favor of Third Parties. Borrower or any Grantor defaults under . . . any other agreement, in favor of any . . . person that may materially affect any of Borrower's property or Borrower's

ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

. . . .

Insolvency. The . . . appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors . . . .

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower . . . against any collateral securing the loan. . . .

. . . .

Adverse Change. A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

Insecurity. Lender in good faith believes itself insecure.

Primebank also referenced the following language from the first mortgage on the

Trust's farm:

EVENTS OF DEFAULT. Each of the following, at Lender's option, shall constitute an Event of Default under this Mortgage:

Payment Default. Grantor fails to make any payment when due under the Indebtedness.

Default on Other Payments. Failure of Grantor within the time required by this Mortgage to make any . . . payment necessary to prevent filing of or to effect discharge of any lien.

Other Defaults. Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

Default in Favor of Third Parties. Should Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any . . . person that may materially affect any of Grantor's property or Grantor's ability to repay the Indebtedness or Grantor's ability to perform Grantor's obligations under this Mortgage or any of the Related Documents.

. . . .

Insolvency. The . . . appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout . . . .

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor . . . against any property securing the Indebtedness. . . .

Breach of Other Agreement. Any breach by Grantor under the terms of any other agreement between Grantor and Lender that is

not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Grantor to Lender, whether existing now or later.

. . . .

Adverse Change. A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

Insecurity. Lender in good faith believes itself insecure.

The notice of default and right to cure continued:

The Note is in default because of the default under the Second Mortgage.

The Note is in default because of the commencement of foreclosure proceeding against the Property securing the Note.

The Note is in default because there has been a material adverse change in the Willard Trust's financial condition triggered by the bankruptcy of B-40 [Farms] and the Willard Trust's failure to submit a repayment plan and to provide assurances that it wants to keep the Property.

The Note is in default because the Bank in good faith deems itself insecure due to the bankruptcy of B-40, the defaults under Your Son's Notes,[6] the default under the Second Mortgage and the Willard Trust's failure to submit a repayment plan and to provide assurances it wants to keep the Property.

The Note is a demand Note. Demand is hereby made for full payment of the Note, including principal, interest and reimbursables due under the attorney fee clauses and lender expenditure clause. Failure to immediately pay the Note upon this demand is a further default under the Note.

The First Mortgage is in default because of the Willard Trust's default under the Second Mortgage.

The First Mortgage is in default because of the commencement of foreclosure proceeding against the Property.

The First Mortgage is in default because there has been a material adverse change in the Willard Trust's financial condition evidenced by the bankruptcy of B-40 and the Willard Trust's failure to submit a repayment plan and to provide assurances that it wants to keep the Trust Property.

---

[6] The notice of default and right to cure defined "Your Son's Notes" as ten of the twelve notes B-40 executed: the $977,000 note, the $1,471,000 note, the $138,000 note, the $121,000 note, the $2,847,000 note, the $821,000 note, the $300,025 note, the $386,000 note, the $50,000 note, and the $175,000 note." (The only notes not included were the $1,100,000 note, which was largely guaranteed by the Farm Services Agency, and the $125,000 note, which was not a demand note).

> The First Mortgage is in default because the Bank in good faith deems itself insecure due to the bankruptcy of B-40, the defaults under Your Son's Notes, the default under the Second Mortgage and the Willard Trust's failure to submit a repayment plan and to provide assurances it wants to keep the Property.
>
> The Note securing the First Mortgage is a demand Note. Demand has been made for full payment of the Note securing the First Mortgage. Failure to immediately pay the Note upon this demand is a further default under the First Mortgage.
>
> Pursuant to Iowa Code § 654.2A(3), the Willard Trust has the right to cure the defaults identified above by paying, no later than June 5, 2020, all amounts owing, as identified above, under the Note and Your Son's Notes . . . .

For relief, Primebank requested judgment in favor of the unpaid balance of the Trust's note ($512,315.68) plus interest, reasonable costs, and attorney fees.

In its proposed eighteenth claim, Primebank asked the court to foreclose on the Trust's farm property, as both the Trust's $590,000 note—secured by the first mortgage—and the other notes entered into by Scott and Primebank—which the bank maintained were all secured by the second mortgage on the Trust's property—were in default. In support of its broad reading of the Trust's second mortgage, Primebank referenced that mortgage's "cross-collateralization clause" (in which the Trust was the grantor and Scott was listed as "borrower"):

> **CROSS-COLLATERALIZATION.** In addition to the Note, this Mortgage secures all obligations, debts and liabilities, plus interest thereon, of either Grantor or Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower and Grantor or any one or more of them, whether not existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower or Grantor maybe liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by an statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

The bank also asserted the second trust mortgage defined the word "note" broadly—not limiting the second mortgage as security for just the $977,000 note executed by Scott on May 11, 2011. Primebank also cited the "future advances" clause of the second mortgage, which stated:

> **FUTURE ADVANCES.** In addition to the Note, this Mortgage secures all future advances made by Lender to Borrower or Grantor whether or not the advances are made pursuant to a commitment. Specifically, without limitation, this Mortgage secures, in addition to the amounts specified in the Note, all future amounts Lender in its discretion may loan to Borrower or Grantor, together with all interest thereon; however, in no event shall such future advances (excluding interest) exceed in the aggregate $800,000.00.

The Trust resisted, arguing that because Primebank had voluntarily dismissed the claims against it, "[t]here is no petition pending against Willard TeGrootenhuis which the proposed amendment can amend." The Trust also argued that the bank "failed to comply with Iowa Code sections 654.2A[7] and 654.2B[8] [(2020)]—a precondition to acceleration of the note secured by the mortgage—thereby requiring dismissal of the claims against Willard." The Trust claimed that Primebank sent it a notice of default and right to cure on April 20, which "fix[ed] the date for curing the default on June 5, 2020," stating it would seek to foreclose the first mortgage on the Trust's property (the security for the Trust's note of $590,000) and the second mortgage of up to $800,000 (for Scott's $977,000 note) unless the Trust paid "all amount owing . . . under the Notes . . . and Your Son's Notes." The Trust asserted the notice was "ambiguous" and did not "allow[] anyone to determine the amount of all unpaid installments due at the

---

[7] This section covers notice and the right to cure default regarding agricultural land.
[8] This section provides the requirements for notice of right to cure.

time of tender, without acceleration, as to the Trust Note and/or the debt alleged to be secured by the First Trust Mortgage." The Trust complained that the "amounts owing" on the notice of default and right to cure "appear[ed] to total at least $6,948,691" and claimed that at the time it received the notice of default and right to cure, "all annual installments which were due before then [on the Trust's $590,000 note] had been paid, i.e., the Trust Note was current" without another installment being due until August 1, 2020.

In a written reply brief, Primebank asserted that the Trust mischaracterized what remained after Primebank's partial dismissal without prejudice and that the notice of default and right to cure provided that the default of the Trust's first mortgage was "due to [m]ortgage defaults and material adverse changes, not some payment default under the Trust Note." It maintained the notice "[d]istinguished between the amounts required to cure the default and the foreclosure dollar limits" and that, when going through the statutorily-required mediation, "the Trust and its attorneys indicated that they understand the Trust [n]ote default's nature. . . . At no time did they express the confusion they now feign in their [r]esistance." Additionally, Primebank claimed the Trust failed to offer any "recognized reason" to deny the bank's request to amend its petition.

The court heard this and other issues on October 19 and later, in a written ruling, granted Primebank's request to amend its petition. Primebank filed its amended petition in late October 2020.

Then in August 2021, the case was reassigned to another judge. The judge set another hearing "on pending motions and to address the status of the case." In response, Primebank submitted a "trial brief," asking the court for a judgment on

the Trust's note and a foreclosure decree on the two mortgages on the Trust's farm property. The Trust also filed a trial brief, asserting the following legal issues: (1) whether the court had subject matter jurisdiction to adjudicate Primebank's claims because the bank initiated the lawsuit without participating in mediation with the Trust and before the court found the bank would suffer irreparable harm by the necessary delay to complete mediation—as required by Iowa Code chapter 654; (2) whether Primebank failed to comply with the right to cure requirements of chapter 654 and if that required dismissal of Primebank's petition; (3) whether extrinsic evidence of the parties' intent was necessary to determine the meaning of the contracts; (4) whether the dragnet clause[9] of the Trust's second mortgage could be enforced for debt that Scott took on after the execution of the second mortgage on May 11, 2015; and (5) whether Primebank could recover attorney fees and costs from the Trust.

At trial on September 1, the Trust was the only defendant to appear and challenge Primebank—not Scott, Michelle, nor B-40 Farms.[10]

Kevin Roozing, vice president of Primebank, testified on behalf of the bank. He compared the language in the Trust's first mortgage and the language in the second mortgage—noting the first mortgage defined "Note" as "the promissory note dated May 11, 2015, *in the original principal amount of $590,009.69* from

---

[9] A clause providing that collateral given to secure one loan from a lender to a borrower also secures other obligations of the borrower to that lender is sometimes referred to as a dragnet clause. *See Blue Grass Sav. Bank v. Cmty. Bank & Tr. Co.*, 941 N.W.2d 20, 24 (Iowa 2020); *Freese Leasing, Inc. & Union Tr. & Sav. Bank*, 243 N.W.2d 921, 923 (Iowa 1977).

[10] Scott appeared in person and testified as a witness, but no attorney appeared for him, Michelle, or B-40 Farms and no argument was made on behalf of any defendant other than the Trust.

Grantor to Lender" while the second mortgage defined "Note" as "the promissory note dated May 11, 2015, up to the original principal amount of $800,000.00 from Borrower to Lender." Roozing testified the bank intentionally used different language in the first and second mortgage and that the second mortgage, with the phrase "up to", "would be the dollar amount that this mortgage goes up to, the amount that we can use it for. It's not tied directly to a note. It's the advance option up to [$]800,000." When asked, he agreed that Primebank "request[ed] that the trust give this property, the trust property, to secure the borrowers', [Scott's,] obligations beyond the date [the second mortgage was executed], May 11, 2015." On cross-examination, the Trust's attorney elicited testimony from Roozing that in order to cure the default, the Trust would be required to pay the more than $7 million that was listed in the notice, which included the unpaid balances on notes made to Scott after May 11, 2015. Roozing was not aware of Primebank ever informing Willard, as the trustee, of any additional loans that Scott executed with the bank after the Trust executed the second mortgage on May 11, 2015. The Trust's attorney asked Roozing, "So as far as the Bank knows, Willard had no idea that 6.4 million dollars of loans were being made to [Scott] after May 11 of 2015; correct?" Roozing responded, "That I don't know. Not that I know of, but I'm not aware of what might be there." Roozing was also not aware of any Primebank documents referring to the second Trust mortgage that Willard saw and signed after May 11, 2015.

Timothy Gesink was a market president at Primebank as of May 11, 2015. He testified he spoke with Willard (as trustee) before Willard signed the second mortgage, pledging the trust's property to secure Scott's loans. Gesink stated his

"common practice" was as follows: "I would take them through the mortgage, through—you know, it's highlighted in here, the amount that they're pledging, the date of the mortgage, the property, the cross-collateralization section, talk about the future advances, the grantor's representations, the payment and performance." He had a "general recollection" of doing this with Willard; the loan closing was Gesink's only meeting with Willard—all negotiations had been between Primebank and Scott. Gesink denied ever telling Scott or Willard "that other mortgages would be used to satisfy debts before . . . the [Trust's] second mortgage." Gesink also did not recall ever telling Scott or Willard "that other mortgages would be primary over" the mortgage the Trust gave to secure Scott's $977,000 note. Gesink testified that, when going over the Trust's second mortgage with Willard, he "would have just told him that this mortgage encompasses the debt, plus any future debt that Scott incurs" up to the $800,000 he was pledging. During his deposition testimony—which was admitted at trial—Gesink testified he did not have any conversations with Willard after May 11, 2015 regarding any additional lending made to Scott. Also, when asked during his deposition, "[W]hat loan would be paid first if it was necessary to foreclose the mortgage on the acreage owned by Scott?" Gesink answered, "My understanding is his acreage loan would be paid first."

After trial, both Primebank and the Trust submitted trial briefs. Primebank asserted that Scott's defaults on its notes—including the note for $977,000 secured by the Scott's 400th Street acreage—constituted default under the second Trust mortgage. And the default under the second trust mortgage was an "event of default" under the cross-default terms in both the first Trust mortgage and the trust note.

The Trust asked the court to find it was without subject matter jurisdiction as to any of Primebank's claims and "declare that all rulings, orders, and judgements after the petition are void"—relying on section 654A.6(1)(a)'s mediation requirement. The Trust maintained that Primebank's action against the Trust was initiated on January 3, 2020—not with the filing of the amended petition on October 27, 2020—at which time the bank had not yet obtained a mediation release. Alternatively, the Trust argued the bank failed to comply with the right-to-cure requirements of section 654.2A, which required the case to be dismissed. The Trust disputed Primebank's assertion that it had not accelerated the debt when it included the total outstanding balance in its "right to cure" notice, while Primebank claimed the notes were "demand" notes—not term or installment—and so it could demand the balance at any time without having accelerated them. The Trust also complained that in its "right to cure" notice, the bank "stated an amount to cure, but did not describe in the notice the performance required to cure any of the nonpayment defaults." If the court did not find Primebank's petition was void or required dismissal, the Trust asked the court to:

> find that (1) the Trust Property is not collateral security for the post-May 11, 2015 loans to Scott/Michelle/B-40, (2) the Trust Property is not collateral security for the $1,100,000.00 Note, and (3) the Second Trust Mortgage secures only the deficiency remaining on the [$977,000] Note after enforcement of the First 400th Street Mortgage, where the total debt secured by the Trust Property is $800,000.

The Trust conceded the second Trust mortgage contained "cross-collateralization and future advances provisions" but claimed that language was not conclusive to establish the parties intended the second Trust mortgage to secure up to $800,000 of the debts Scott took on in later notes (rather than securing just the $977,000

note Scott executed on May 11, 2015). Next, the Trust argued, "Primebank contends that the Trust Property secures the indebtedness of the Trust Note plus $800,000 of debt from [Scott]. The [Trust's] position is, and the evidence shows, that the total debt secured by the Trust Property is $800,000 inclusive of the Trust Note." The Trust claimed the issue may be moot because "it [was] likely that liquidation of the [the 400th Street] acreage will trigger the release of the Second Trust Mortgage"—because the "current fair market value" of the acreage was $1,300,000 while the indebtedness of the $977,000 note was $1,098,060. The Trust continued, "In fact, as long as the deficiency judgment is less than $190,000 (i.e. a sale at $908,000), the two positions yield the same result, i.e. total debt against the Trust Property of $800,000."[11] In conclusion, the Trust asked the court to

> direct the 400th Street Property (the acreage) sold to satisfy the judgment for the [$977,000] Note, retaining jurisdiction to determine the resulting deficiency, if any. Then, if there is a deficiency, the court can require the receiver to account for his activities, including Iowa Code section 654.14(1), and payment of rents, profits, and other proceeds of collateral securing the note. Then, if there still remains a deficiency, the court can make such further orders as required under Iowa Code section 654.5 as to the Trust Property.

In its written ruling, the district court concluded Primebank "sufficiently complied with Iowa Code [s]ection 654A.6(1)(a)," such that the court had subject matter jurisdiction. The court decided that because Primebank obtained the mediation release as to the Trust before filing its amended petition in

---

[11] This argument is based on the Trust's claim that the total amount the second mortgage secured was up to $800,000; with the Trust's note balance of $610,039 and a hypothetical $190,000 deficiency judgment on B-40's $977,000 note, the Trust would reach the $800,000 total.

October 2020, any defect was cured. In reaching this conclusion, the court noted that its interpretation gave effect to the legislative intent, stating:

> Here, Primebank sought to stay the mortgage foreclosure claims, filed and obtained [an Iowa Rule of Civil Procedure] 1.943 dismissal without prejudice of those claims, and incorporated the claims at issue in the amended petition. In doing so, the mediation provision, as intended, created a procedural hurdle by which defendants received the benefit of participating in mandatory mediation and foreclosure proceedings.

Next, the court concluded that Primebank provided the Trust "with a valid statutory notice of default and right to cure" because it sent the notice on April 20, 2020, stating "the Trust's defaults, how and when the Trust could cure them, and set the deadline for payment at June 5, 2020—[forty-five] days after the notice." The notice laid out both the monetary and non-monetary defaults Primebank was claiming. According to the district court, "Primebank had not previously filed a foreclosure action on the [first] Trust [m]ortgage and had dismissed its foreclosure action on the [s]econd Trust [m]ortgage. On October 27, 2020—after the passing of June 5, 2020—Primebank initiated its foreclosure action." And Primebank had not accelerated the Trust's obligation because the Trust's note was a demand note, meaning its maturity came on its date of signing.

Finally, the court looked to interpret the second Trust mortgage. It decided the future-advances and cross-collateralization clauses were dragnet clauses that were to be construed against the bank. Then it concluded (1) "it was not the intent of the parties' that the second trust note secure any of the post May 11, 2015 loans" and (2) the parties intended for the second Trust mortgage to secure up to $800,000 credit for Scott on top of the Trust's note of $590,000.

The district court noted it had granted default judgment against Scott on March 27, 2020 and awarded Primebank all amounts under the notes; the amounts owed on the notes and default judgment were yet unpaid. The court foreclosed on Scott's 400th Street acreage and ordered the property to be sold at public auction "[a]s soon as practicable and as directed by Primebank." The proceeds from the sale were to "be paid first to satisfy amounts owing under [all twelve default] Notes and [d]efault [j]udgment," with "any over-plus" to be "held by the Clerk of the Court in trust for [d]efendants." The court also entered judgment against Scott "for all Primebank's reasonable attorneys' fees and costs" incurred in enforcing and collecting on the notes. As for the Trust's note and mortgages, the court entered final judgment against the Trust for the Trust's note—with an unpaid balance of $610,039.61 as of August 1, 2021 and an additional $248.97 per diem added due the default interest rate. The court also entered judgment against the Trust "for all reasonable costs and attorneys' fees incurred in the collection and enforcement of the Trust [n]ote and enforcement of the Bank's rights in the security for the Trust [n]ote." The court foreclosed the first and second Trust mortgages and ordered the Trust's farm sold at public auction "[a]s soon as practicable and as directed by Primebank." The court ordered the proceeds from the sale of the property to "be paid first to satisfy amounts owing under the Trust [n]ote and then second to satisfy amounts owing under the [n]ote in the maximum amount of $800,000 and [d]efault [j]udgment, and third that any plus-over shall be held by the Clerk of the Court in trust."

The Trust moved to reconsider, enlarge, and amend under Iowa Rule of Civil Procedure 1.904(2). The Trust asked the district court to amend its ruling to

specify that the proceeds from the sale of Scott's 400th Street acreage would first be applied to his $977,000 note—before any of his eleven other notes—and "that the Trust's 80 acres secures only the deficiency judgment remaining on the [$977,000] [n]ote, *after* enforcement of the First 400th Street [m]ortgage." In other words, the Trust wanted the court to direct that the proceeds of the sale from Scott's acreage would be specifically applied to the $977,000 note and then the Trust's property would be sold, with its proceeds being first applied to its own $590,000 note and, only after that, whatever was left would be applied to any unpaid balance on the $977,000 note (up to $800,000—the amount set by the second mortgage). It claimed this sequence was what the parties intended and cited to one question posed to Gesink, along with his answer. The Trust also challenged the amount purportedly owed on the Trust's $590,000 note and Scott's $977,000 note, claiming that the balances provided in the court's decree did not take into account any rents and profits from the properties and other collateral (such as the pigs) that the court-appointed receiver had collected. The Trust requested an accounting as to each property before the judicial sale of Scott's acreage and the Trust's farm. The Trust also argued that Primebank was not entitled to attorney fees because it failed to comply with Iowa Code sections 654.4B(1) and 625.25.

On October 22, 2021, the district court set a hearing on the Trust's rule 1.904(2) motion and ordered "both parties [to] submit written balance calculations annotated to admitted evidence supporting each of their arguments as to the proper principal balance due" by the time of the hearing.

Primebank resisted the Trust's motion. It argued that, insofar as the Trust could make arguments on behalf of Scott, the district court's decree properly left the timing of the sale of the 400th Street property and the application of its proceeds to Scott's notes and default judgment to Primebank's discretion because Scott's 400th Street mortgage stated that it secured "all obligations, debts, and liabilities, plus interest thereon, of . . . Borrower to Lender" (i.e. nothing restricts it to securing just Scott's $977,000 note) and waived "any and all right to have the [p]roperty marshalled." According to Primebank, the Trust's request to have the order of sale and application of proceeds determined by the court was at odds with the mortgage contract Scott entered into and the Trust had not provided a valid reason for the court to rewrite the terms. As to the Trust's request for an accounting showing all payments made on the notes, Primebank argued the Trust never raised the issue at trial and could not use a rule 1.904(2) motion to introduce new evidence. And finally, Primebank maintained the court correctly concluded it is entitled to attorney fees and costs, as the Trust's note, the first Trust mortgage, and the second Trust mortgage all contain provisions agreeing the bank could recover attorney fees and, if section 625.25 applies, the bank complied by giving the Trust notice it was in default and how to cure.

The Trust replied, asserting it was raising issues that impacted it—not just Scott—because the order of sale and application of proceeds for Scott's debts directly impacted the Trust's liability for any outstanding debt on the $ 977,000 note as well its own note. The Trust claimed:

> Primebank intends to have the special execution as to the 400th Street Property, first, so that any proceeds of the sheriff's sale of that property are applied to indebtedness *other than* the [$977,000] Note.

> This means [there] will be no reduction of the [$977,000] Note before the sale of the Trust's 80 acres. Under this scheme, after the sale of the Trust's 80 acres, Primebank will cause the proceeds to be applied to the unpaid balance of the Trust Note plus $800,000 (plus interest) to the [$977,000] Note.

(Citation omitted.) The Trust again relied on Gesink's deposition testimony that was admitted at trial; Gesink was asked, "[W]hat loan would be paid first if it was necessary to foreclose the mortgage on the acreage owned by Scott?" Gesink responded, "My understanding is his acreage loan would be paid first." And the Trust maintained that Primebank did not comply with section 654.4B(1) because, while the bank sent notices to the Trust on April 20, 2020 and to Scott on May 5, the action was initially commenced on January 3, 2020.

Following a hearing,[12] the district court entered a written ruling. It presented the issue as whether the court can, "[w]ithout specific agreement, evidence of agreement, or clear evidence as to intent dictate the order by which the proceeds of foreclosure are handled, . . . order an equitable application proceeds such that an amount of the sale proceeds from the 400th Street [property] is directed to the [$977,000] Note." The court concluded that specific performance ordering Primebank to direct the sale proceeds of Scott's 400th Street acreage to satisfy the $977,000 note was not available to the Trust because the Trust was in uncured default as to Trust's second mortgage (which secured Scott's debt to refinance the acreage) and "specific performance is precluded when the party seeking specific performance has not performed its obligation." The court also considered whether equitable relief was available to the Trust, concluding that to grant the Trust's

---

[12] This hearing was reported, but we do not have a transcript of the proceedings.

request to direct the sale and application of proceeds from the 400th Street property to the $977,000 note, it would require the court to reform Scott's 400th Street mortgage agreement by modifying the cross-collateralization clause, removing the clause waiving the right to have the property marshalled, and inserting a clause directing its sale proceeds. The court decided reformation was not appropriate because the Trust did not prove that Scott's 400th Street mortgage failed to express the parties' mutual intent and agreement or that enforcing the contract as written would result in undue hardship or unconscionability. The court overruled the Trust's request for an accounting because the court asked both parties to submit an annotated calculation of loan balance, and the Trust "did not bring forward any annotated argument showing that the [c]ourt made an error in fact by establishing the principle amounts of judgments as shown."[13] Lastly, the court concluded Primebank had complied with Iowa Code sections 654.4B(1) and 625.25, so it was entitled to attorney fees as the various mortgage and note contracts provided.[14]

Only the Trust[15] appeals.[16]

---

[13] Primebank filed its loan calculation for the $977,000 note.

[14] The district court ruled that Primebank is entitled to attorney fees but no specific amount has yet been set. Early on, the district court agreed "to reserve the issues of attorneys' fees and costs until later on once they have been liquidated."

[15] Neither Scott, Michelle, nor B-40 Farms is a party to this appeal.

[16] Before oral arguments were heard in this case, the Trust filed a motion asking us to expand or supplement the record. Primebank did not resist. But Iowa Rule of Appellate Procedure 6.801 controls the record on appeal; it is limited to "[o]nly the original documents and exhibits filed in the district court case from which the appeal is taken, the transcript of proceedings, if any, and a certified copy of the related docket and court calendar." We may only consider matters that have transpired during the appeal—matters that are technically outside the record—to establish or counter a claim of mootness. *See In re L.H.*, 480 N.W.2d 43, 45 (Iowa 1992). So, we deny the Trust's motion.

## II. Standard of Review.

A mortgage foreclosure proceeding is in equity, *see* Iowa Code § 654.1, so our review is de novo. *See* Iowa R. App. P. 6.907. This means we "examin[e] both the facts and law and adjudicat[e] anew those issues properly preserved and presented." *In re A.R.*, 932 N.W.2d 588, 589 n.1 (Iowa Ct. App. 2019). We are not bound by the district court's factual findings, but we give them weight—especially when witness credibility is involved. *Id.*

Insofar as we are required to review the district court's interpretation of statutes, we review for errors at law. *Standard Water Control Sys. v. Jones*, 938 N.W.2d 651, 656 (Iowa 2020).

## III. Discussion.

### A. The Trust's Exposure for Scott's $977,000 Note.

The Trust urges us to use our broad powers in equity to require Primebank to sell Scott's 400th Street acreage and apply the proceeds directly to the debt affiliated with his $977,000 note before any proceeds from the sale of the Trust's farm are applied to the debt. The Trust argues we should do so because the parties intended the Trust's second mortgage worth up to $800,000 to be "additional" security.

The Trust asks us to enforce the parties' purported intent rather than the mortgage contracts as written. Scott's 400th Street mortgage contains a cross-collateralization clause that states the mortgage "secures all obligations, debts, and liabilities, plus interest thereon, of . . . [Scott] to Lender"—it is undisputed this mortgage secures more than just Scott's $977,000 note. The mortgage contract also includes a waiver of Scott's "right to have the Property marshalled." *Marshal,*

*Black's Law Dictionary* (3rd pocket ed. 2006) ("To arrange or rank in order."). The Trust has not pointed to anything in Scott's 400th Street mortgage that requires Primebank to apply the proceeds from the sale of the property to Scott's $977,000 note ahead of Scott's other default notes. The Trust's second mortgage also contains a waiver of the Trust's right to have its property marshalled. And, similarly, the Trust does not argue that anything in this mortgage requires Primebank to wait to apply the proceeds from the sale of the Trust's farm to Scott's $977,000 note until after proceeds from Scott's acreage are applied. On this issue, the relevant provisions in the mortgage contracts are unambiguous. *See Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999) ("[A] contract is not ambiguous merely because the parties disagree over its meaning. Instead, an ambiguity occurs in a contract when a genuine uncertainty exists concerning which of two reasonable interpretations is proper." (internal citation omitted)); *see also Petty v. Faith Bible Christian Outreach Ctr., Inc.*, 584 N.W.2d 303, 306 (Iowa 1998) ("[W]here the intent of the parties is expressed in clear and unambiguous language, we enforce the contract as written.").

And—even if we concluded the relevant contract provisions are ambiguous on this issue and relied on extrinsic evidence to ascertain the parties' intent, *see Hartig Drug*, 602 N.W.2d at 797—the Trust points to almost no evidence that the parties actually intended what the Trust now requests. The Trust relies on multiple documents that state the Trust would give a second mortgage on the farm as "additional" security for Scott's $977,000 note as evidence the Trust's collateral is supposed to be second in line to Scott's collateral. But "additional" just means "existing or coming by way of addition" or "added." *Additional, Webster's Third*

*New International Dictionary* (1993). Contrary to the Trust's suggestion, nothing about the term "additional" implies anything about order. The Trust's only other evidence is the deposition testimony of Gesink, who was asked, "[W]hat loan would be paid first if it was necessary to foreclose the mortgage on the acreage owned by Scott?" and answered, "My understanding is his acreage loan would be paid first." This testimony offers some support for the Trust's request, but Gesink's personal understanding is not enough for us to contravene the clear terms of the contracts that both Scott and the Trust signed. Nothing in the record shows that Gesink communicated this understanding with either Scott or the Trust, and neither Scott nor the Trust testified as to their own intention or understanding—the Trust didn't testify at all. *See Peak v. Adams*, 799 N.W.2d 535, 544 (Iowa 2011) ("Evidence of the parties' *mutual* intent is what matters . . . .").

Because the mortgage contracts are unambiguous on this issue, we agree with the district court that they should be applied as written. We decline to use any equitable powers we have in this instance to provide the remedy the Trust requests. *See SDG Macerich Props., L.P. v. Stanek Inc.*, 648 N.W.2d 581, 588 (Iowa 2002) ("A court of equity should not be the first, but the last resort. It is bound by a contract as the parties have made it and has no authority to substitute for it another and different agreement, and should afford relief only where obviously there is fraud, real hardship, oppression, mistake, unconscionable results, and the other grounds of righteousness, justice and mortality." (citation omitted)).

### B. Attorney Fees.

The Trust challenges the district court's ruling that Primebank is entitled to recover attorney fees under the note and mortgage contracts. "The right to recover

attorney fees as costs does not exist at common law. In Iowa, they are not allowed 'in the absence of a statute or agreement expressly authorizing it.'" *Van Sloun v. Agans Bros, Inc.*, 778 N.W.2d 174, 182 (Iowa 2010) (internal citation omitted); *see* Iowa Code § 625.22(1) ("When judgment is recovered upon a written contract containing an agreement to pay an attorney fee, the court shall allow and tax as a part of the costs a reasonable attorney fee to be determined by the court."). Even when a contract allows for the recovery of attorney fees, the "right exists solely by virtue of the statute." *Bankers Trust Co. v. Woltz*, 326 N.W.2d 274, 278 (Iowa 1982). So, compliance with the various attorney-fee statutes is necessary for a party to recover under the contracts. *See, e.g.*, *Peoples Tr. & Sav. Bank v. Baird*, 346 N.W.2d 1, 4 (Iowa 1984) ("The bank's failure to give adequate statutory notice was not an affirmative defense because the bank was required, as part of its claim for attorney fees, to prove that adequate notice was given.").

The Trust does not dispute that each of the three contracts to which the Trust is a party—the Trust's note, the first mortgage on the Trust's farm, and the second mortgage on the Trust's farm—provides a valid provision allowing Primebank to recover attorney fees; it challenges the district court's interpretation of sections 654.4B(1) and 625.25 and its conclusion that Primebank complied with both statutes.

Iowa Code section 625.25 provides:

> No such attorney fee shall be taxed if the defendant is a resident of the county and the action is not aided by an attachment, unless it shall be made to appear that such defendant had information of and a reasonable opportunity to pay the debt before action was brought. This provision, however, shall not apply to contracts made payable by their terms at a particular place, the

maker of which has not tendered the sum due at the place named in the contract.

Generally, this statute requires that the debtor-party is given "a presuit 'reasonable opportunity to pay the debt' before allowing attorney fees." *NCJC, Inc. v. WMG, L.C.*, 960 N.W.2d 58, 61 (Iowa 2021); *see also Peoples Tr.*, 346 N.W.2 at 4 ("The primary purpose of Iowa Code section 625.25 is to provide the debtor a reasonable opportunity to discharge his debt before suit is filed in order to avoid payment of any costs or attorney fees . . . ."). Like the district court, we read section 625.25 in conjunction with section 654.4B(1), which defines the "reasonable opportunity" the debtor must be given as fourteen days:

> Prior to commencing a foreclosure on the accelerated balance of a mortgage loan and after termination of any applicable cure period, including but not limited to those provided in section 654.2A or 654.2D, *a creditor shall give the borrower a fourteen-day demand for payment of the accelerated balance to qualify for an award of attorney fees under section 625.25 on the accelerated balance.*

Iowa Code § 654.4B(1) (emphasis added).

The district court concluded section 625.25 did not preclude Primebank's recovery of attorney fees because the Trust was given reasonable opportunity to pay before the suit was brought.[17] In reaching this conclusion, the court focused

---

[17] In its appellate brief, Primebank argues section 625.25 also does not preclude its recovery of attorney fees because the Trust note was payable on demand—not accelerated—so it was a "contract[] made payable by [its] terms at a particular place, the maker of which has not tendered the sum due at the place named in the contract." *See NCJC Inc.*, 960 N.W.2d at 63 (providing that the bar to attorney fees in section 625.25 "exempts . . . situations where the contract requires performance at a particular place"). But we cannot apply this exemption under these facts. Whether Primebank accelerated the contract or made a demand—either way—the Trust needed to be informed by Primebank so the Trust could comply. In other words, if Primebank never communicated the demand to the Trust, the Trust could not know of the change in payment schedule. And if the Trust did not know of the changed payment scheduled, how could it have had a

on the notice of default and right to cure that Primebank sent the Trust on April 20, 2020—several months before the bank filed its amended petition on October 27. *See Sibley State Bank v. Braaksma*, No. 17-1021, 3471850, at *1 (Iowa Ct. App. July 18, 2018) (using the bank's demand for payment of the accelerated balances of the promissory notes as the basis for compliance with section 654.4B).

But Primebank's notice of default and right to cure came nearly four months after it first filed a lawsuit seeking to foreclose on the Trust's second mortgage. And Primebank has not pointed to any notice given to the Trust at least fourteen days before that suit was filed. *See NCJC Inc.*, 960 N.W.2d at 63 (providing the focus of section 625.25 "is temporal"). So the bank cannot recover all of its attorney fees.

We recognize Primebank later voluntarily dismissed its claim seeking to foreclose the Trust's second mortgage and then included it in its amended petition—filed about six months after the notice of default was provided to the Trust. But Primebank does not cite any authority to establish that it can cure an earlier failure to comply with sections 625.25 and 654.4B by dismissing a claim and refiling it after complying with notice requirement. And we think allowing it to do so would contradict the purpose of those statutes, which are meant to give the debtor the chance to pay its debt without incurring attorney fees. *See Peoples Tr.*,

---

reasonable opportunity to pay the debt that Primebank now claimed was due? Making the "normal" payments at the known location would not cure the defaults. *See Moore v. Crandall*, 124 N.W. 812, 815 (Iowa 1910) ("The evident purpose of the last sentence [of what is now section 625.25] is to obviate the necessity of a demand at maturity when the place of payment is specified, but has no application to a situation where the debt only becomes due on election unless the maker is advised thereof long enough before suit brought to afford a reasonable opportunity to pay.").

346 N.W.2 at 4. In fact, allowing the creditor to recover attorney fees when the creditor filed a claim without giving notice, voluntarily dismissed that claim, then sent notice and refiled would likely cause the debtor-party to be forced to pay even more attorney fees due to the extra legal work.[18]

As far as we know, Primebank has not yet requested an assessment of attorney fees against the Trust. When it does, the bank may not recover fees incurred in foreclosing the Trust's second mortgage. We recognize some of the legal work done applied equally to both the foreclosure of the second mortgage as well as Primebank's claims for money judgment against the Trust for its defaulted note and in seeking to foreclose the Trust's first mortgage. The district court, in using its expertise to set the appropriate amount of reasonable legal fees, will determine an appropriate reduction for that partially-recoverable work. *See Boyle v. Alum-Line, Inc.*, 773 N.W.2d 829, 832–33 (Iowa 2009) (recognizing the district court is an expert in what constitutes reasonable attorney fees and that it "look[s] at the whole picture and, us[es] independent judgment with the benefit of hindsight" in deciding an appropriate award (citation omitted)).

---

[18] For the first time, the Trust argues that "the notice that fixes the termination of the cure period under Iowa Code section 654.2A (a notice of default and the right to cure) and the 'fourteen-day demand for payment' cannot be one and the same." The Trust never suggested this interpretation to the district court, so we do not consider it now. *See State v. Rutledge*, 600 N.W.2d 324, 325 (Iowa 1999) ("Nothing is more basic in the law of appeal and error than the axiom that a party cannot sing a song to us that was not first sung in trial court."); *see also Detmer v. La'James Coll. of Hairstyling, Inc*, No. 21-0220, 2021 WL 5919050, at *8 (Iowa Ct. App. Dec. 15, 2021) ("[I]t is the court, not the parties, that determines whether error has been preserved—even in the face of an opposing party's acquiescence."). Yet we note that the Trust was unable to cite any case law interpreting the statutes as it now asks us to do.

**IV. Conclusion.**

Because the portions of the mortgage contracts at issue are unambiguous, we agree with the district court that they should be applied as written; we will not direct the order the proceeds are to be applied to the defaulted notes. However, we limit Primebank's recovery of attorney fees from the Trust to the enforcement of the Trust's note and the first mortgage; Primebank did not give the Trust reasonable opportunity to pay before it filed its lawsuit seeking to foreclose on the second mortgage as statutorily required to give.

**AFFIRMED IN PART AND REVERSED IN PART.**